UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

**KATHLEEN M. BENNETT, Individually and as the representative of all participants and beneficiaries of the Bennett Funding Group, Inc. Profit Sharing Plan a/k/a Aloha Leasing Profit Sharing Plan, Aloha Leasing Pension Plan, and the Bennett Funding Group, Inc.**

                    Plaintiffs,

    v.                                                       5:99-CV-827 (HGM/GHL)

**MANUFACTURERS & TRADERS, as successor in interest by merger to OnBank & Trust Co., in its capacity as Court-appointed Trustee for the Bennett Funding Group, Inc. Profit Sharing Plan a/k/a Aloha Leasing Profit Sharing Plan, Aloha Leasing Pension Plan, and Bennett Funding Group, Inc. 401(k) Profit Sharing Plan; RICHARD C. BREEDEN, as the Chapter 11 Trustee for Bennett Funding Group, Inc. and Bennett Management and Development Corp.; BENNETT FUNDING GROUP, INC. PROFIT SHARING PLAN a/k/a ALOHA LEASING PROFIT SHARING PLAN; ALOHA LEASING PENSION PLAN; and the BENNETT FUNDING GROUP, INC. 401(k) PROFIT SHARING PLAN,**

                    Defendants.
_____

| APPEARANCES: | OF COUNSEL: |
|---|---|
| ELGIDELY LAW OFFICE<br>Attorney for Plaintiff<br>1401 Northeast Tenth Street<br>Pompano Beach, Florida 33060 | ROBERT F. ELGIDELY, ESQ. |
| GUY LAW OFFICE<br>Attorney for Plaintiff<br>850 Fay Road<br>Syracuse, New York 13219-3010 | CARL F. GUY, ESQ. |
| HISCOCK & BARCLAY, LLP<br>Attorneys for Chapter 11 Trustee<br>221 South Warren Street | SUSAN R. KATZOFF, ESQ. |

Post Office Box 4878
Syracuse, New York 13221-4878

HISCOCK & BARCLAY, LLP    RAYMOND N. MCCABE, ESQ.
Attorneys for Chapter 11 Trustee
1100 M & T Center
Three Fountain Plaza
Buffalo, New York 14203-1486

**HOWARD G. MUNSON**
**Senior United States District Judge**

## MEMORANDUM-DECISION AND ORDER

Currently before the court are defendant's motion for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure and plaintiff's cross-motion for summary judgment. For the following reasons, the court GRANTS defendant's motion for summary judgment and DENIES plaintiff's cross-motion for summary judgment.

## BACKGROUND

**I.   Complaint and Motions for Summary Judgment**

On May 26, 1999, plaintiff, Kathleen M. Bennett, filed a complaint against defendants Manufacturers & Traders Trust Co., Richard C. Breeden, Bennett Funding Group, Inc. Profit Sharing Plan ("Profit Sharing Plan"), Aloha Leasing Pension Plan ("Pension Plan"), and the Bennett Funding Group, Inc. 401(k) Profit Sharing Plan ("401(k) Plan") (collectively "Plans"). Breeden, as the Chapter 11 Trustee for the Bennett Companies, moves for summary judgment to permit the Plans to setoff the entire amount otherwise payable to Bennett to restore losses to the Plans caused by Bennett's breach of fiduciary duty to the participants of the Plans. *See* Dkt. No. 47, Def.'s Mem. of Law at 2. Bennett cross-moves for summary judgment to effect the immediate distribution of her vested retirement benefits together with an award of prejudgment interest, attorneys' fees and costs. *See* Dkt. No. 49, Pl.'s Mem. of Law at 21.

**II.    Facts**[1]

    *A.    Bennett's Claims*

Bennett sued as a participant in and beneficiary of the Profit Sharing Plan, the Pension Plan and the 401(k) Plan to compel distribution of her benefits under the Plans.[2] *See* Dkt. No. 47, Def.'s Statement of Material Facts at ¶ 1. On April 14, 1997, OnBank & Trust Company ("OnBank") sent letters to all participants of the 401(k) Plan advising that they would be able to withdraw their 401(k) Deferral Funds. Id. at ¶ 2. On April 18, 1997, Bennett sent a letter formally requesting her benefits from those Plans. Id. ¶ 3. OnBank failed to comply with Bennett's request for her benefits. Id. at ¶ 4. Initially, OnBank moved the court for an Order prohibiting it from distributing plan benefits to members of the Bennett family, including plaintiff. Later, however, OnBank withdrew its motion as to Bennett and amended the 401(k) plan to incorporate section 206(d) of the Employee Retirement Income Security Act of 1974 ("ERISA"). Such amendment thus permitted a direct setoff of plan benefits otherwise payable to a plan participant to recover losses to the plan by reason of a breach of fiduciary duty by such participant. *See* Dkt. No. 47, Defs.' Mem. of Law at 3.

    *B.    The Bennett Companies–Administration and Operation*

The Bennett Companies included the Bennett Funding Group, Inc. ("BFG"), Bennett

---

[1] Where the court cites to defendant's Statement of Material Facts submitted in accordance with L.R. 7.1(a)(3), those facts are deemed admitted because Bennett, as the opposing party, failed to file a response to defendant's Statement of Material Facts. *See* L.R. 7.1(a)(3) ("The opposing party shall file a response to the Statement of Material Facts. The Non-movant's response shall mirror the movant's Statement of Material Facts by admitting and/or denying each of the movant's assertions in matching numbered paragraphs."). Bennett similarly failed to file a Statement of Material facts as part of her cross-motion for summary judgment. *See* L.R. 7.1(a)(3) ("Any motion for summary judgment shall contain a Statement of Material Facts. . . . Failure of the moving party to submit an accurate and complete Statement of Material Facts shall result in a denial of the motion.."). The Local Rules are not empty formalities. Local Rules, such as 7.1(a)(3), "serve to notify the parties of the factual support for their opponent's arguments, but more importantly inform the court of the evidence and arguments in an organized way–thus facilitating its judgment of the necessity for a trial." Little v. Cox' Supermarkets, 71 F. 3d 637, 641 (7th Cir. 1995).

[2] Although Bennett's complaint purports to be filed as a class action with Bennett suing "as the representative of all participants and beneficiaries," *see* Dkt. No. 1, Compl. at ¶ 5, of the Plans, Bennett has never filed a motion for class certification or taken any steps to determine who the Participants might be or to what benefits they might be entitled in such a class action. *See* Dkt. No. 47, Def.'s Statement of Material Facts at ¶ 5.

Receivables Corporation ("BRC"), Bennett Receivables Corporation II ("BRC II"), Bennett Management & Development Corporation ("BMDC"), American Marine International Ltd. ("AMI"), Resort Services Company, Inc. ("RSC"), The Processing Center, Inc. ("TPC"), and Aloha Capital Corporation ("ACC") (collectively "Bennett Companies"). *See* Dkt. No. 47, Def.'s Statement of Material Facts at ¶ 7. BFG, BRC, BRC II, BMDC, AMI, RSC, ACC and TOC all entered bankruptcy, voluntarily or involuntarily, between March 26, 1996, and the end of April 1996, whereupon Richard Breeden was appointed Chapter 11 Trustee with respect to all of the corporations. Id. at ¶ 8. The Bennett Companies were wholly controlled by the Bennett family.[3] Bennett was the President of the Bennett Companies from their inception until December 1995, *see* id. at ¶ 6, and she also was a member of the Bennett Companies' Board of Directors. Bennett and her husband, Edmund T. Bennett, who served as Chairman of the Board, were the sole shareholders of BFG from its inception in 1977 through 1995. Id. at ¶ 9. Bennett also held a seat on the Corporate Credit Committee and the Chief Executive Committee. Further, she was the head of Human Resources for the Bennett Companies and ran the Collections and Customer Service Departments. Id. at ¶ 11. As President, Bennett knew everything that transpired in the Bennett companies. Id. at ¶ 12. Bennett's testimony before the Securities and Exchange Commission ("SEC") and her testimony at her examination before trial in related matters illustrates this point.

---

[3] In In re Bennett Funding Group, Inc., v. Kirkpatrick & Lockhart, LLP, 336 F.3d 94, 97-98 (2d Cir. 2003), a related case, the Second Circuit, in describing the Bennetts' control of the companies, noted the following:

> The trustee concedes that BFG was a Bennett family "dictatorship." (internal citation omitted). In a report submitted pursuant to 11 U.S.C. § 1106, the trustee admitted "Patrick Bennett's control of the finances of the Bennett companies was complete . . . ." (internal citation omitted).
>
> The Board of Directors plays an integral part in this elaborate scheme. While the Bennett family always held at least 50% of the seats on the Board, there were other directors. It is undisputed, however, that each director was handpicked by Bud and each was a BFG employee; there were no "outside directors." (internal citation omitted). The Board meetings were scripted in advance and each Board member was provided with his "speaking parts" in advance of the meeting. (internal citation omitted).

4

Before the SEC, Bennett testified that she "liked to know everything that's going on in the company, if possible." Dkt. No. 47, Def.'s Mem. of Law at 6. At her examination before trial she testified that she would have had "access to BFG's financial records," if she wanted it, and that as President of the Companies, she would have had access to the information had she asked for it. Id. Plaintiff further testified as follows:

> Q: Just as with your presidency of the [BFG], as President of Aloha Leasing, if you had wanted, would you have had access to all financial documents pertaining to the company and its pension funds?
>
> A: I would like to say there's not a thing in that company, if I had wanted to see it, I could not have seen.

Id. at 7.

Bennett's son, Patrick Bennett, was the Chief Financial Officer of BFG. *See* Dkt. No. 47, Def.'s Statement of Material Facts at ¶ 10. The BFG sponsored the Profit Sharing Plan and Edmund and Patrick Bennett were its named trustees. The Profit sharing Plan invested BFG with the specific power to appoint and remove the Plan Administrator. Because the BFG never appointed a Plan Administrator, the responsibility for the performance of such duties remained the BFG's, *i.e.*, Kathleen Bennett's responsibility as a fifty percent shareholder in the BFG. Id. at ¶ 13.

Edmund and Patrick Bennett served as trustees to the Pension Plan. As trustees, they served at the pleasure of the Board of Directors, which had the power to fill any vacancies. The Trustees were responsible for maintaining the accounts that set forth the fiscal transactions of the Aloha Leasing Plan and reporting the same to the company on an annual basis. Id. at ¶ 14.

The BFG was the sponsor and administrator of the 401(k) Plan, which provided it with the power to appoint and remove the plan's Trustees. Edmund and Patrick Bennett, as trustees, were signatories to the plan. The BFG also had the duty under the plan to appoint and remove the Plan Administrator, but because it never appointed a Plan Administrator, the Plan Administrator's

responsibilities fell to the BFG, *i.e.*, Kathleen Bennett as a fifty percent shareholder in the BFG. *See* Dkt. No. 47, Def.'s Statement of Material Facts at ¶ 15.

As of June 30, 2001, according to BFG's records, Bennett deferred $47,696.97 to the 401(k) Plan. The 401(k) Plan employer matched contributions shown on the BFG's books were $25,191.84. The total employer discretionary contributions were $212,451.73. *See* Dkt. No. 47, Def.'s Statement of Material Facts at ¶ 17.

  *C.* *Prohibited Transactions*[4]

Between 1991, and 1995, Patrick Bennett, acting as Trustee of the Plans, orchestrated several

---

[4]ERISA defines "prohibited transaction" as follows:

(1) A fiduciary with respect to a plan shall not cause the plan to engage in a transaction, if he knows or should know that such transaction constitutes a direct or indirect–(A) sale or exchange, or leasing, of any property between the plan and a party in interest; (B) lending of money or other extension of credit between the plan and a party in interest; (C) furnishing of goods, services, or facilities between the plan and a party in interest; (D) transfer to, or use by or for the benefit of a party in interest, of any assets of the plan.

29 U.S.C. § 1106(a)(1)(A),(B),(C),(D).

Parties in interest include:

(A) any fiduciary (including, but not limited to, any administrator, officer, trustee, or custodian), counsel, or employee of such employee benefit plan;(B) a person providing services to such plan; (C) an employer any of whose employees are covered by such plan; (D) an employee organization any of whose members are covered by such plan; (E) an owner, direct or indirect, of 50 percent or more of–(i) the combined voting power of all classes of stock entitled to vote or the total value of shares of all classes of stock of a corporation. (ii) the capital interest or the profits interest of a partnership, or (iii) the beneficial interest of a trust or unincorporated enterprise, which is an employer or an employee organization described in subparagraph (C) or (D); (F) a relative (as defined in paragraph (15)) of any individual described in subparagraph (A), (B), (C), or (E);(G) a corporation, partnership, or trust or estate of which (or in which) 50 percent or more of–(i) the combined voting power of all classes of stock entitled to vote or the total value of shares of all classes of stock of such corporation, (ii) the capital interest or profits interest of such partnership, or (iii) the beneficial interest of such trust or estate, is owned directly or indirectly, or held by persons described in subparagraph (A), (B), (C), (D), or (E); (H) an employee, officer, director (or an individual having powers or responsibilities similar to those of officers or directors), or a 10 percent or more shareholder directly or indirectly, of a person described in subparagraph (B), (C), (D), (E), or (G), or of the employee benefit plan; or (I) a 10 percent or more (directly or indirectly in capital or profits) partner or joint venturer of a person described in subparagraph (B), (C), (D), (E), or (G).

29 U.S.C. § 1002(14).

prohibited transactions, as defined by ERISA, thereby dissipating the Plans' accounts by a total of $2,660,000 for the benefit of the Bennett Companies and their two owners, Kathleen and Edmund Bennett. Id. at ¶ 16.

As to the Profit Sharing Plan, on February 5, 1991, Patrick Bennett, in his capacity as trustee for the Profit Sharing Plan, authorized a $25,000 wire transfer from the Profit Sharing Plan to BFG's Chemical Bank Account. This transfer was not a loan, did not consummate a purchase by the Profit Sharing Plan for anything of value, nor has it been repaid by BFG. On April 4, 1991, Patrick Bennett, in his capacity as trustee for the Profit Sharing Plan, executed a $35,000 Profit Sharing Plan check payable to BFG. This transfer was not a loan, did not consummate a purchase by the Profit Sharing Plan for anything of value, nor has it been repaid by BFG. *See* Dkt. No. 47, Def.'s Mem. of Law at 8. On July 29, 1991, pursuant to instructions issued by Patrick Bennett in his capacity as trustee for the Profit Sharing Plan, BFG Vice-President Robert Bryan authorized a $7,500 wire transfer from the Profit Sharing Plan to BFG. This transfer was not a loan, did not consummate a purchase by the Profit Sharing Plan for anything of value, nor has it been repaid by BFG. *See* id. at 9.

In 1988, Patrick Bennett, in his capacity as trustee for the Profit Sharing Plan, directed the Plan to purchase a $200,000 debenture issued by Resort Funding, Inc., also known as RSC. The debenture was due to be repaid in full with interest on December 31, 1995. On December 30, 1995, in lieu of payment of the note, Patrick Bennett caused the Plan to accept the assignment of a separate $200,000 promissory note from one Bennett Company, Bennett Associates, to another, BMDC. Patrick Bennett also caused the Profit Sharing Plan to accept a second promissory note from Bennett Associates in the amount of $200,000. Neither note was secured, and neither note has been repaid. This type of "Dual-Note Transaction" occurred frequently at the Bennett Companies. *See* Dkt. No. 47, Def.'s Mem. of Law at 9.

On February 22, 1996, Patrick Bennett, in his capacity as trustee for the Profit Sharing Plan, authorized the issuance of a $50,000 Profit Sharing Plan Check to Hemlock Investor Associates ("Hemlock"). In exchange, Charles Genovese, on behalf of Hemlock, executed a promissory note to the Profit Sharing Plan with interest payable monthly and principal payable in full on March 1, 2016. Hemlock has not repaid the Profit Sharing Plan according to the terms of the note. The note was not secured by any collateral. *See* id. at 9, 11.

On February 26, 1996, Patrick Bennett, in his capacity as trustee for the Profit Sharing Plan, authorized the issuance of a $50,000 check payable to BFG. In consideration for this $50,000 transfer, Patrick Bennett caused the Profit Sharing Plan to accept promissory notes in a Dual-Note Transaction. Neither Note was secured, and neither note has been repaid. *See* id. at 9-10.

Patrick Bennett, acting in his capacity as trustee for the Pension Plan, authorized the following transactions on the following dates: a $150,000 wire transfer to BFG on February 5, 1991; a $50,000 check payable to BFG on April 4, 1991; a $7,500 wire transfer to BFG on July 29, 1991; and a $500,000 payment for mutual fund pass-through certificate issued to BFG on February 16, 1993. None of these transactions were loans, nor did they consummate a purchase by the Pension Plan for anything of value, nor did BFG repay any of the amounts. *See* id. at 10.

Patrick Bennett, acting in his capacity as trustee for the Pension Plan, authorized Dual-Note transactions in consideration for funds transferred from the Pension Plan to BFG in the following amounts on the following dates: $290,000 on September 12, 1995, in consideration for a wire transfer to BFG; $60,000 on September 25, 1995, in consideration for a wire transfer to BFG; $50,000 on December 20, 1995, in lieu of payment on a 1988 RSC debenture; $165,000 on February 13, 1996, in consideration for a check payable to BFG; and $200,000 on February 26, 1996, in consideration for a check payable to BFG. None of the promissory notes issued in these transactions were secured and none have been repaid. *See* Dkt. No. 47, Def.'s Mem. of Law at 10-11.

On September 25, 1995, Patrick Bennett, in his capacity as trustee for the 401(k) Plan, authorized a $670,000 wire transfer to BFG. In partial consideration for the transfer, Patrick Bennett caused the 401(k) Plan to accept Dual-Notes from Bennett Associates and BMDC in the amount of $420,000. In further consideration for the transfer Patrick Bennett caused the 401(k) Plan to accept the assignment of a bridge note to BMDC from The North American Communications Group, Inc. ("NACG"), an unrelated entity. Patrick Bennett, however, never advised NACG that BMDC had assigned the Bridge Note to the 401(k) Plan. Accordingly, NACG paid the interest due on the bridge note, as well as prepaid interest on a further ninety-day extension, to Patrick Bennett, who accepted it on behalf of BMDC and not on behalf of the 401(k) Plan. In sum, Patrick Bennett orchestrated the removal of $2,660,000 from the Plans for the benefit of the Bennett Companies. *See* Dkt. No. 47, Def.'s Statement of Material Facts at ¶ 16.

## DISCUSSION

### I. Summary Judgment Standard

The standard for summary judgment is familiar and well-settled. Rule 56 allows for summary judgment where the evidence demonstrates that "there is no genuine issue of any material fact and the moving party is entitled to judgment as a matter of law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L. Ed. 2d 202 (1986). Summary judgment is properly regarded as an integral part of the Federal Rules as a whole, which are designed "to secure the just, speedy and inexpensive determination of every action." Celotex Corp. v. Catrett, 477 U.S. 317, 326, 106 S.Ct. 2548, 2554, 91 L. Ed. 2d 265 (1991) (quoting Rule 1 of the Federal Rules of Civil Procedure). A court may grant a motion for summary judgment when the moving party carries its burden of showing that no triable issues of fact exist. *See* Thompson v. Gjivoje, 896 F.2d 716, 720 (2d Cir.1990). In light of this burden, any inferences to be drawn from the facts must be viewed in the light most favorable to the non-moving party. *See* id.; United States v. Diebold, Inc., 369 U.S.

654, 655, 82 S.Ct. 993, 994, 8 L. Ed. 2d 176 (1962) (per curiam). If the moving party meets its burden, the burden shifts to the non-moving party to come forward with "specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e). To defeat a motion for summary judgment, however, the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L. Ed. 2d 538 (1986). A dispute regarding a material fact is genuine "if evidence is such that a reasonable jury could return a verdict for the non-moving party." Anderson, 477 U.S. at 248, 106 S. Ct. at 2510. When reasonable minds could not differ as to the import of the evidence, then summary judgment is proper. *See* Anderson, 477 U.S. at 250-251, 106 S.Ct. at 2511.

## II.     Bennett's Fiduciary Status/Duty/Performance Under ERISA

Central to the outcome of the parties' motions is the question of whether Bennett was a fiduciary as defined under ERISA. A fiduciary is one who owes duties to the plan participants and beneficiaries and who must exercise care, skill, prudence, and diligence in fulfilling those duties. 29 U.S.C. § 1104(a). Under ERISA, an individual or entity can become a fiduciary in three ways: (1) being named as a fiduciary in the written plan instrument, 29 U.S.C. § 1102(a); (2) being named and identified as a fiduciary pursuant to a procedure specified in the written plan instrument, 29 U.S.C. § 1102(a)(2); or (3) meeting the definition of a fiduciary contained in 29 U.S.C. § 1002(21):

> [A] person is a fiduciary with respect to a plan to the extent (i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets, (ii) he renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so, or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan.

29 U.S.C. § 1002(21)(A). ERISA also sets forth the standard of care with which a fiduciary shall discharge his duties:

> [A] fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and – (A) for the exclusive purpose of: (i) providing benefits to participants and their beneficiaries; and (ii) defraying reasonable expenses of administering the plan, (B) with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in conduct of an enterprise of a like character and with like aims.

29 U.S.C. § 1104(a)(1). Here, defendants do not claim that Bennett was a named fiduciary, but rather contend that she functioned as fiduciary. *See* Mertens v. Hewitt Associates, 508 U.S. 248, 262, 113 S.Ct. 2063, 2071, 124 L.Ed.2d 161 (1993) ("ERISA . . . defines "fiduciary" not in terms of formal trusteeship, but in *functional* terms of control and authority over the plan, *see* 29 U.S.C. § 1002(21)(A), thus expanding the universe of persons subject to fiduciary duties–and to damages–under § 409(a)."); LoPresti v. Terwilliger, 126 F.3d 34, 40 (2d Cir. 1997); Keach v. U.S. Trust Co., N.A., 234 F.Supp.2d 872, 882 (C.D.Ill. 2002) ("ERISA ties fiduciary responsibilities to a person's actual authority, and thus, that person is a fiduciary only "to the extent" that he or she exercises control or authority over the plan.") (citing Leigh v. Engle, 727 F.2d 113, 133 (7th Cir. 1984)). Defendants argue that it is well-established that the power to appoint plan trustees confers fiduciary status and that because Bennett, as a member of the board of directors, had the authority to appoint, retain and remove those individuals who make, for example, investment decisions for a plan, she is a fiduciary. *See* Liss v. Smith, 991 F.Supp. 278, 310-11 (S.D.N.Y. 1998) ("The power to appoint and remove trustees carries with it the concomitant duty to monitor those trustees' performance."); Beam v. HSBC Bank USA, 2003 WL 22087589 at *3, n.14 (W.D.N.Y. August 19, 2004) (citing Liss, 991 F.Supp. 278); Keach, 234 F.Supp.2d at 881-82 (citing Engle, 727 F.2d at 133-35 (finding defendants were fiduciaries to the extent they performed fiduciary functions in selecting and retaining plan administrators and that the duty to select and retain is coupled with the duty to "appropriately monitor the administrators' actions")).

In <u>Keach</u>, the court explained that when board of directors members are responsible for the selection and retention of plan fiduciaries, they exercise "discretionary authority or discretionary control respecting management of such plan and are, therefore, fiduciaries with respect to the plan." 234 F.Supp.2d at 882 (internal quotation and citation omitted). Once fiduciary status is established, the question becomes how far the fiduciary duties extend. Following in-step with <u>Engle</u>, the <u>Keach</u> court noted that the duty to appoint carries with it the duty to appropriately monitor, but the court's inquiry did not stop there. Beyond the fiduciaries' formal control with respect to the plan, limited to selection and retention of administrators, the court considered what real authority they had over plan investments by virtue of their having appointed the plan administrators. *See* <u>Keach</u>, 234 F.Supp.2d at 882. This approach allowed the court in <u>Engle</u> to observe that in selecting the particular administrators that were selected, the fiduciary had obtained de facto control over plan investment decisions. 727 F.2d at 134-35, n.33. The <u>Keach</u> court similarly reasoned that "the selection of [the particular] trustee for the [Employee Stock Ownership Plan] was so inextricably intertwined with the desired end of effectuating the stock purchase transaction that the act of appointing the trustee essentially exercised de facto control over the plans assets and management." 234 F.Supp.2d at 882-83.

In addition, both parties cite a bulletin issued by the Secretary of Labor, which was published in the Code of Federal Regulations, that interprets ERISA's definition of fiduciary:

> Q: In the case of a plan established and maintained by an employer, are members of the board of directors of the employer fiduciaries with respect to the plan?
>
> A: Members of the board of directors of an employer which maintains an employee benefit plan will be fiduciaries only to the extent that they have responsibility for the functions described in section 3(21)(A) of the Act. For example, the board of directors may be responsible for the selection and retention of plan fiduciaries. In such a case, members of the board of directors exercise "discretionary authority or discretionary control respecting management of such plan" and are, therefore, fiduciaries with respect to the plan. However, their responsibility, and consequently, their liability, is limited to the selection and retention of fiduciaries.

Engle, 727 F.2d at 133-134 (citing ERISA Interpretative Bulletin 75-8, 29 C.F.R. § 2509.75-8 (1983)).

In contrast, relying on Henry v. Champlain Enterprises, Inc., 288 F.Supp.2d 202 (N.D.N.Y. 2003) and Confer v. Custom Engineering, 952 F.2d 34 (3rd Cir. 1991), Bennett characterizes her involvement with the Plans as "ministerial," arguing that her relationship with the Plans was limited to her membership on the BFG's Board of Directors. *See* Dkt. No. 49, Pl.'s Mem. of Law at 12-13. In Henry, the court held that an individual's status as a member of a board of directors with the authority to appoint a trustee, without more, was insufficient to confer fiduciary status to him. In so holding, the court emphasized the absence of conduct amounting to any discretionary control or authority and noted that the plaintiffs had not alleged any negligence in the hiring of the trustee. *See* Henry, 288 F.Supp.2d at 222.

In Confer, the Third Circuit held that "when an ERISA plan names a corporation as a fiduciary, the officers who exercise discretion on behalf of that corporation are not fiduciaries within the meaning of section 3(21)(A)(iii), unless it can be shown that these officers have individual discretionary roles as to plan administration." Confer, 952 F.2d at 37. The Third Circuit of course decided Confer prior to the Supreme Court's decision in Mertens and thus without the benefit of its explanation that ERISA defined fiduciary in functional terms of control and authority over the plan. Other courts, relying on Mertens, have specifically rejected Confer. The Ninth Circuit explained that:

> The gist of [Confer's] holding is that where a corporation is designated as the plan fiduciary, an officer's actions will not render that officer a fiduciary where those actions are ones with which the designated named fiduciary is chargeable. In other words, when the named fiduciary does not designate the officer, either explicitly or impliedly, as a fiduciary, the officer is shielded from personally becoming a fiduciary, so long as he acts within the corporate form . . . [W]e reject the Third Circuit's interpretation in Confer that an officer who acts on behalf of a named fiduciary corporation cannot be a fiduciary if he acts within his official capacity and

13

if no fiduciary duties are delegated to him individually.

Kayes v. Pacific Lumber Co., 51 F.3d 1449, 1459-61 (9th Circuit 1995); *see also* Chao v. Crouse, 346 F.Supp.2d 975, 985 (S.D.Ind. 2004) (declining to adopt Confer's holding).

The court finds the reasoning and approach taken in Liss, Keach and Engle persuasive. The uncontested facts above make clear that Bennett was invested with the duty to appoint the trustees who managed the Plans; therefore, she had the concomitant duty to monitor those trustees. In Liss, the court found that the "ongoing responsibilities of a fiduciary who has appointed trustees requires that: '[a]t reasonable intervals the performance of trustees and other fiduciaries should be reviewed by the appointing fiduciary in such a manner as may be reasonably expected to ensure that their performance has been in compliance with the terms of the plan and statutory standards, and satisfies the needs of the plan.'" 991 F.Supp. at 311 (citing 29 C.F.R. 2509.75-8 at FR-17). The "limited" fiduciary obligations imposed on one who appoints trustees thus includes the obligation to ensure that the appointees are performing their fiduciary obligations. The duty to monitor carries with it, of course, the duty to take action upon discovery that the appointed fiduciaries are not performing properly. Bennett's fiduciary duties with respect to the Plans arose at their inception, *see* Liss, 991 F.Supp. at 311, but from the mid-1980s through the end of 1995, Bennett never reviewed the various retirement plans. *See* Dkt. No. 47, Ex. X, at 160-61. Bennett failed to monitor the Plans' trustees.

Bennett was one of the four family members who controlled the Bennett Companies. Bennett was the Bennett Companies' President, its Human Resources Director, a member of its Board of Directors, and a fifty percent shareholder. Her positions afforded her keen insight into and uncommon knowledge of the Bennett Companies' operations. Despite her unimpeded access to the Bennett Companies' assorted documentation, Bennett never reviewed nor requested to review any documentation with respect to the Plan investments, nor did she track what transfers or investments were made for the supposed benefit of the Plans.

14

The facts make clear that Bennett's degree of involvement with the Plans and the influence she exerted or could have exerted over the Plans' assets constitute "something more" than the mere holding of a corporate office. In re Bennett Funding Group, Inc., the case that exposed the Bennett Companies' Ponzi scheme and foretold its demise, revealed that Bennett, "when confronted with clear evidence of fraud in late 1995, . . . sought to guarantee control over BFG and its finances in perpetuity and placed all of BFG stock in a trust, the language of which expressly assured that Patrick was to be appointed Chairman of the Board and CEO of BFG." 336 F.3d at 98. It also revealed that "the Bennetts diverted funds to themselves or to entities that they owned–including funds to maintain Bud and Kathleen's yacht, *The Lady Kathleen*." Id. The Second Circuit concluded that "[i]t is undisputed that Patrick exercised unfettered control over the financial operations of BFG with . . . Kathleen's full approval. . . . [U]ncontroverted evidence before the district court demonstrated that Bud and Kathleen were aware of Patrick's actions, and that they diverted funds to themselves or entities they owned. . . . Their conduct amounted to acquiescence in the fraud perpetrated by Patrick." Id. at 101. Similarly, the court here concludes that Bennett acquiesced in the fraudulent transfers orchestrated by Patrick Bennett. By selecting her son Patrick Bennett and her husband Edmund Bennett as trustees to the Plans, Bennett obtained de facto control over the Plans and their management. By selecting and appointing the Plans' trustees in her own interest and in the interest of family members who intended to (and did) use the Plans' assets in their own interest and for their own account, and by failing to take appropriate steps to remove Patrick Bennett and Edmund Bennett as trustees whom she knew were breaching their fiduciary obligations to the Plans, Bennett failed to act solely in the interest of the Plans' participants and beneficiaries in violation of ERISA §§ 404(a)(1)(A) and (B). *See* Whitfield v. Tomasso, 682 F.Supp. 1287, 1305 (E.D.N.Y. 1988). In failing to monitor the Plans' trustees, Bennett breached her fiduciary duties to all of the Plans' participants except to the members of her own family who benefitted from the

15

prohibited transactions. Nothing in the record now before the court shows that Bennett took steps either to insure that Patrick Bennett and Edmund Bennett were fulfilling their fiduciary obligations or to remedy any violations that occurred.

Congress has placed the burden of proving causation on the plaintiff, or movant as here the parties' posture dictates, by requiring him to prove that the losses "result [ed] from" the defendant's inaction. *See* 29 U.S.C. §§ 1109(a), 1105(a)(3). Because movant seeks a remedy for a breach of fiduciary duty claim, it follows that all elements of such a claim, including the demonstration of some causal connection between the breach and a loss, are necessary. *See* Henry, 288 F.Supp.2d at 237. Therefore, here the movant must also demonstrate that the Plan's losses resulted from Bennett's inaction.

At oral argument, movant argued that if Bennett had performed her fiduciary duties and monitored Patrick Bennett and Edmund Bennett, removed them in light of the prohibited transactions, and substituted an independent trustee to manage the Plans' assets, then the Plans would not have sustained such damage. *See* Dkt. No. 54, Hr'g Tr. at 10.

In opposing the movant's setoff remedy, Bennett relies upon Silverman v. Mutual Ben. Life Ins. Co., 138 F.3d 98 (2d Cir.1998), in which the Second Circuit explained that "[a]n ERISA plaintiff who seeks compensatory damages under § 1105(a)(3), [(liability for breach of co-fiduciary)], must show, inter alia, that the losses 'result[ed] from' the defendant's failure to take reasonable steps to remedy the co-fiduciary's breach." Id. at 105 (citing 29 U.S.C. §§ 1109(a), 1105(a)(3) (1985); Diduck v. Kaszycki & Sons Contractors, 974 F.2d 270, 279 (2d Cir.1992)).

Bennett argues that like the plaintiff in Silverman, movant has failed to demonstrate that Bennett could have successfully removed the Plans' Trustees by bringing the matter before BFG's Board of Directors. Bennett argues that with two of the remaining three Board members, being the Plans' Trustees, *i.e.*, Patrick Bennett and Edmund Bennett, any effort she made to remove her son

16

and husband would have likely resulted in a deadlock–an exercise in futility for which she should not be punished for having failed to undertake. The court is not convinced that such a "hopeless" situation overcomes one's fiduciary obligations.

The court concludes that Bennett's breach of her fiduciary duty contributorily caused the Plans' losses. Bennett's failure to monitor allowed the trustees to effect multiple fraudulent transfers to the Plans' detriment. Assuming *arguendo* that Bennett was not otherwise aware of the fraudulent transfers, as her positions within the Bennett Companies might suggest and given the Bennett Companies' structure as a closely held family company, if Bennett had properly performed her fiduciary duties, then she would have uncovered the trustees' fraudulent transfers. At that point, Bennett would have faced two options. She could have (1) removed and replaced the trustees or (2) maintained the status quo and become an accessory to their fraud. The options themselves reveal the causal connection between Bennett's breach of her fiduciary duties and the losses suffered by the Plans.

### III.    Setoff of Plan Benefits

As to remedies, ERISA provides that

> Any person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this title shall be personally liable to make good to such plan any losses to the plan resulting from each such breach, and to restore to such plan any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary [*i.e.*, restitution], and shall be subject to such other equitable or remedial relief as the court may deem appropriate, including removal of such fiduciary.

29 U.S.C. § 1109(a). In support of the setoff as an equitable remedy, movant relies on Mertens, 508 U.S. at 252, 113 S.Ct. at 2066 and Great-West Life & Annuity Ins. Co. v. Knudsen, 534 U.S. 204, 212-14, 122 S.Ct. 708, 714-15, 151 L.Ed.2d 635 (2002), in which the Supreme Court has held that restitution is an appropriate remedy for the breach of a fiduciary's duties. "[F]or restitution to lie in equity, the action generally must seek not to impose personal liability on the defendant, but to

restore to the plaintiff particular funds or property in the defendant's possession." Great-West, 534 U.S. at 214, 122 S.Ct. at 714-15.  Having demonstrated that Bennett breached her fiduciary duty and a causal connection between that breach and the Plans' losses, the court upholds defendant's denial of Bennett's request for her benefits.  Furthermore, the court authorizes the proposed setoff of the entire amount otherwise payable to Bennett so as to allow those benefits to be used to compensate the other participants of the Plan and to restore to them the losses that they incurred as a result of Bennett's breach of her fiduciary duty.

## CONCLUSION

**WHEREFORE,** after careful consideration of the file in this matter including the parties' submissions, oral argument, and the applicable law, the court hereby

**GRANTS** defendants' motion for summary judgment and

**DENIES** plaintiff's cross motion for summary judgment.

**IT IS SO ORDERED.**

Dated: November 2, 2005
Syracuse, New York

_____
Howard G. Munson
Senior  U.S. District Judge